Filed 9/7/16  P. v. Garcia CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ERMILINDO JOSE GARCIA,<br><br>Defendant and Appellant. | F069668<br><br>(Super. Ct. No. SC065625A)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  Michael Bush, Judge.

James F. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Ryan B. McCarroll, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]      Before Kane, Acting P.J., Franson, J., and Smith, J.

Ermilindo Jose Garcia filed a petition seeking to be resentenced pursuant to the Three Strikes Reform Act of 2012 (the Act). The trial court denied the petition concluding Garcia posed an unreasonable risk of danger to public safety. Garcia argues the trial court abused its discretion in denying the petition. We disagree and affirm the order.

## FACTUAL AND PROCEDURAL SUMMARY

Garcia filed a petition seeking recall of his sentence pursuant to Penal Code section 1170.126.[1] The prosecution impliedly conceded that Garcia was eligible for resentencing, but argued the petition should be denied because Garcia posed an unreasonable risk of danger to public safety. The argument was based on Garcia's prior convictions, his behavior in prison, and his psychiatric history. Both Garcia and his sister testified at the hearing on the petition. Garcia's sister, Yvonne Delatorre, testified she would help Garcia should he be released, including emotionally and financially. Garcia testified about his crimes, the lessons he learned, and his accomplishments while in prison. We provide a more comprehensive summary of Garcia's testimony in the discussion portion of this opinion.

In a written ruling, the trial court denied the petition finding Garcia would pose an unreasonable risk of danger to public safety. The relevant portion of the ruling stated, "The court finds that the People have met their burden that the Petitioner would pose an unreasonable risk of danger to the public safety. The court has considered all aspects of the information and evidence presented, including but not limited to Petitioner's overall mental health issues and in-custody behavior, all of which support a denial of the petition. The court understands the Petitioner has made progress in his mental health issues, but believes he still poses an unreasonable risk of danger to the public safety."

---

[1] All further statutory references are to the Penal Code unless noted otherwise.

# DISCUSSION

Section 1170.126, enacted as part of the Act, defines those eligible for resentencing as inmates serving an indeterminate third strike sentence and (1) not serving a sentence for a crime that is listed as a serious or violent felony (§§ 667.5, subd. (c) and 1192.7, subd. (c)); (2) not serving a sentence for a crime committed under the circumstances listed in section 667 subdivision (e)(2)(C) clauses (i) through (iii), or section 1170.12, subdivision (c)(2)(C), clauses (i) through (iii); and (3) who does not have a prior conviction for an offense appearing in section 667, subdivision (e)(2)(C), clause (iv), or section 1170.12, subdivision (c)(2)(C), clause (iv). (§ 1170.126, subd. (e).)

If an inmate is eligible under the statute, then he must be resentenced "unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).)

This statute requires the trial court to conduct a two-step analysis. First, the trial court must determine if the inmate is eligible for resentencing. If the inmate is eligible for resentencing, then the trial court must decide if resentencing the inmate would pose an unreasonable risk of danger to public safety. An inmate will be resentenced only if he or she is eligible, and the trial court concludes he or she does not pose an unreasonable risk of danger to public safety. (*People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279, 1299.)

Since the parties agree Garcia is eligible for resentencing, the only issue is whether the trial court erred when it concluded Garcia posed an unreasonable risk of danger to public safety if he were released. Section 1170.126, subdivision (g), provides guidelines for the trial court when exercising its discretion on this issue. This subdivision provides the trial court may consider "(1) The petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes; ¶ (2) The petitioner's disciplinary record and record of rehabilitation while incarcerated; and ¶ (3) Any other evidence the court,

3.

within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety."

Section 1170.126, subdivision (f) provides the trial court with discretion in determining whether an inmate petitioning for relief poses an unreasonable risk of danger to public safety. We will reverse the trial court's findings only if it abused that discretion. "'Abuse of discretion' has been defined as follows: '"The discretion intended ... is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not mental discretion, to be exercised ex gratia, but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice.'" [Citations.]" (*People v. Superior Court (Mouchaourab)* (2000) 78 Cal.App.4th 403, 413.) In other words, an abuse of discretion occurs when the trial court "exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Jordan* (1986) 42 Cal.3d 308, 316.) A trial court abuses its discretion if the factual findings critical to its decision are not supported by the evidence. (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998.) It is appellant's burden to establish the trial court abused its discretion. (*Steele v. Jensen Instrument Co.* (1997) 59 Cal.App.4th 326, 331.)

Garcia asserts at various points in his argument the trial court abused its discretion because there is not substantial evidence to support the trial court's conclusion that Garcia posed an unreasonable risk of danger to public safety. Neither party identified any factual dispute in these proceedings, and the trial court did not suggest it disbelieved any of the testimony. The question is, therefore, do the undisputed facts establish that Garcia posed an unreasonable risk of danger to public safety?

Each party relies on those facts they feel support their contention. We, on the other hand, review the entire record to determine if there are facts to support the trial court's exercise of its discretion. The trial court had before it various records including

4.

probation reports prepared for hearings on other crimes, records from Garcia's incarceration, Garcia's testimony, and other documentation provided by Garcia. We will summarize the information under the categories identified in section 1170.126, subdivision (g), recognizing the trial court only referred to Garcia's mental health issues and his conduct in prison in denying the petition.

*Criminal History*

In 1985 Garcia was convicted of grand theft from another person (§ 487, former subd. (2)) and placed on three years' felony probation, including one year in jail. This offense is referenced in two different probation reports, but neither provide any information about the circumstances surrounding the offense. Garcia testified that he took money from a liquor store.

In 1986 he was convicted of unlawful taking of a vehicle (Veh. Code, § 10851), and was placed on two years' felony probation including one year in jail.

In 1987 he was convicted of attempted robbery (§§ 664, 211) and felony witness intimidation (§ 136.1, subd. (c)(1)).[2] Garcia testified he was drunk and attempted to rob an acquaintance to obtain beer and money. The witness intimidation occurred when he told his friend not to tell anyone about the incident. Garcia may have used a knife in the attempted robbery, although his memory was unclear. He was sentenced to three years in prison. This conviction resulted in a finding of probation violation in the above two cases. He was paroled in 1988, and incurred nine parole violations. Garcia testified the parole violations were the result of "[d]irty tests."

Also in 1987 he was convicted of battery on a police officer (§ 243, subd. (b)) and sentenced to 30 days in jail. Garcia testified he was charged with battery on a police officer, but pled to disturbing the peace.

---

**2** The dates are approximate as some of the records were inconsistent.

In 1989, he was convicted of resisting arrest (§ 148), and possession of drug paraphernalia (Health & Saf. Code, § 11364), and was sentenced to 60 days in jail.

In 1989, he was convicted of misdemeanor possession of a controlled substance (Health & Saf. Code, § 11550) and sentenced to one year in jail.

In 1992, he was convicted of resisting arrest (§ 148) and sentenced to 30 days in jail. Also in 1992, he was convicted of misdemeanor petty theft with a prior and sentenced to 240 days in jail.

In 1994, he was convicted of robbery (§ 211) and petty theft with a prior (§ 666). According to the probation report, in two separate incidents Garcia stole a car stereo from the victim, and four bottles of ibuprofen from a grocery store. In the first incident, Garcia allegedly threatened the victim with pruning shears he found in the vehicle, pressing the pruning shears against the side of the victim. He was sentenced to eight years in prison. Garcia testified that he had just gotten out of prison. The victim had agreed to perform some work on his mother's car, but did not do so. When he saw the victim, he asked for a ride, but the victim refused. Eventually Garcia ended up in the vehicle with the victim, and took his stereo because the victim failed to complete the work on Garcia's mother's car. Garcia admitted picking up the pruning shears, and admitted threatening the victim while holding the pruning shears, but denied holding the pruning shears against the victim's ribs. He admitted his actions were wrong.

The crime which resulted in his life sentence occurred in 1995, while he was serving his sentence for the above robbery conviction. He was convicted of possession of narcotics while in prison. (§ 4573.6.) The probation report indicates Garcia's wife smuggled in three balloons, which were apparently swallowed by Garcia during a weekend visit. The balloons contained .32 grams of methamphetamine, 1.59 grams of heroin, and 1.79 grams of marijuana. Two prior convictions that constituted strikes were also found true (§ 667, subds. (b)-(i)), as were two prior prison term enhancements (§ 667.5, subd. (b)). He was sentenced to a term of 25 years to life, imposed

6.

consecutively to the term he was serving for the robbery conviction. Garcia admitted that at the time he was using and selling drugs. He also admitted his wife smuggled the drugs into the prison for him.

*Prison Record*

In 1995, Garcia was found to be under the influence of (inmate manufactured) alcohol and was disciplined with loss of behavioral credit as well as extra work. He was also written up for disruptive behavior on a separate occasion and lost 31 days of behavior credits.

In 1996, Garcia and a second inmate attacked a third inmate. Garcia was charged with a serious rules violation for battery on an inmate with no serious bodily injury.

On three occasions in 1997, Garcia lost his law library privileges for a period of time for talking while in the library in violation of law library polices.

In 1998, inmate manufactured alcohol was found in Garcia's cell. It also appears Garcia and his cellmate engaged in a horseplay/altercation incident. It appears the only punishment imposed was increasing Garcia's confinement in the secured housing unit by three months. Also in 1998, Garcia was counseled for talking while in the law library, and was written up for disruptive behavior on two occasions.

In 2000, Garcia received counseling because his appearance did not comply with prison requirements, specifically his mustache extended beyond the corner of his mouth.

In 2005, Garcia was in an altercation with another prisoner. During the altercation Garcia was stabbed with a writing pen. He was found guilty of participating in mutual combat. The altercation resulted in a temporary loss of some privileges. Garcia explained how the altercation occurred. Garcia was a porter collecting sheets to be washed when he observed another inmate stealing sheets from his cart. An argument ensued, and the two went into the inmate's cell and engaged in mutual combat. Garcia explained, "I didn't go to the CO, because at that time I was still in my ways of not

7.

thinking right, I would say. I should have just went to the CO and told him, but I took it upon myself and let him know he shouldn't be doing that."

Also in 2005, inmate manufactured alcohol was found in Garcia's cell. Garcia was disciplined by a temporary loss of some privileges as a result of this infraction.

In 2007, Garcia was counseled on two occasions for failing to report for his work assignment, or for reporting to work late.

In 2009, Garcia was found in possession of an inmate manufactured tattoo gun. He pled guilty to the offense, which resulted in the loss of some privileges. Garcia explained that at the time he enjoyed the program in which he participated. He became eligible for a different facility (or a different yard at that facility), and he did not want to be transferred. So he put together a rudimentary tattoo gun and asked to be written up so that he would not be transferred. "I mean, it was foolish, because now that I think back about it, you know, I know I shouldn't have did it because now here we are, I'm having to explain 115s that shouldn't have happened."

In 2011, correctional officers located an inmate manufactured tattoo gun in Garcia's cell. Garcia pled guilty to a serious rules violation and as a result lost various privileges for 30 days. Garcia explained he once again was caught on purpose so he could remain in the facility of his choosing. Also in 2011, Garcia was counseled for reporting to work late.

*Other Evidence*

Garcia admitted he was an alcoholic, and that when he drinks he loses control. He began drinking at a very young age. His mother was a drug user, and he spent his childhood with various relatives and foster families. He began smoking marijuana in high school. He escalated to heroin when he was about 16 years old and became addicted. He last used heroin approximately 10 years before the hearing.

Garcia dropped out of high school in the 10th grade. His mother used and sold drugs, so he did not have any supervision, basically doing what he wanted. Most of the

8.

crimes he committed were to obtain money to buy drugs. He admitted he was selfish, and did not care about the consequences for his actions. In his younger days, Garcia would run from the police because he did not want to be arrested.

Garcia has worked as a porter in the prison for a number of years, a job he enjoys because it involves cleaning. He hoped to get a job in the same field when he was released. He also hoped to attend community college when released.

Garcia explained his current medical condition. He stated he has bad circulation because of an issue with his heart, which appears to be related to a heart valve defect.[3] He also has rheumatoid arthritis in his spine, iritis in his eyes, liver damage from his drug and alcohol abuse, damage to his lungs, and a lack of ligaments in his hip.

Garcia admitted he experienced obsessive compulsive disorder (OCD) before he went to prison, but prison exacerbated the condition. His OCD becomes worse when he has a lot of stress. He has difficulties when he has a cellmate who does not clean after himself. His OCD has caused arguments, and he has been struck as a result, but he did not respond. In 2012 he broke his hand when he hit the wall. Garcia explained, "I was going through a lot of these [cellmates because of his OCD] and I just didn't want to do anything. I was frustrated. So when the person left the cell, I just was upset. I just hit the wall. You know, I just – I didn't think about it. I just did it. And I shouldn't have did it. I think my ways now of coping with things, it's a lot better me cleaning then hitting walls."

Annual reviews by the classification committee for the years 2007, 2008, 2009, 2010, 2011, and 2012 were included in the record. Most of the reviews were positive reflecting Garcia's good behavior while incarcerated, but primarily addressed Garcia's need/request for single cell status.

---

[3] We surmise Garcia has a heart valve defect from his testimony, which was unclear.

Although the reason for the request is deleted from the record, his testimony at the hearing and his psychiatric records suggest the reason was because of his OCD. This disorder made it difficult for Garcia to coexist with any cellmate. Most of the reports stated that Garcia's level of dangerousness was low, and he gave no indication of imminent harm to self or others.

In 2011, Garcia told his psychologist that he was not doing well, he was ready to do something stupid, and he was afraid he would hurt someone. Garcia explained he was spending a lot of time thinking about his childhood and the difficulties he lived through. He explained that going to the psychiatrist regularly helped him with those issues. Garcia admitted it took him a while to completely open up to the psychiatrist, but now he no longer fixated on the events of his childhood. "The psychiatrist that I have now helped me a lot. I think me talking about it has made me better, and not being ashamed of the things that happened."

Various psychiatric reports were included in the record. These reports indicate that much of Garcia's anxiety is directly related to having a cellmate. When Garcia has a cellmate his OCD makes it very difficult for him because they are not as organized and clean as Garcia. When allowed to occupy a cell by himself Garcia appears to be able to manage his OCD with little difficulty. He was medicated for his condition, which provided some help. On May 30, 2014, a staff psychiatrist stated that in his opinion Garcia was not a danger to society and could be a contributing member of society.[4]

Garcia stated he had attended Alcoholics Anonymous (AA) and Narcotic Anonymous (NA) meetings for the last year. These meetings helped him to become a

---

[4] The full note states "To Whom It May Concern: [¶] Mr. Garcia was seen under my care at MCSP CCCMS program for the last 3 ½ years. Mr. Garcia attends appointments on time, has been compliant with medication, works hard in therapy and has been a strong advocate for himself. My recommendations for post parole plans include continue medication compliance and follow-up supportive therapy. I believe Mr. Garcia is not a danger and can be a contributing member of society."

better person. He last used narcotics in prison in about 2004, and last used alcohol in about 2005. He no longer has the urge to drink or use narcotics. He also attends CGA meetings (Criminals and Gang Members Anonymous). Garcia explained the meetings were similar to AA and NA meetings. He learned in these meetings to stay "away from people who are in negative situations. People who would drink or [use] drugs, I know not to associate myself with them. Anybody who's even an ex-gang member and who's still drinking or using drugs, I'll stay away from them. If I feel like I'm gonna have some type of relapse, call on my support group, my family." Garcia admitted he began to attend the meetings because the law changed and he had a hope of being released. As he participated in the meetings, however, he began to enjoy and benefit from them.

Garcia and his sister had attempted to arrange for him to continue receiving mental health counseling when he was released, but most agencies stated that they could not make a commitment until they interviewed Garcia. If released, Garcia testified he would immediately seek mental health counseling, and find NA and AA meetings that he could attend. He would also stay away from anyone who was a negative influence.

When the prosecutor asked why Garcia believed he would not drink or use drugs, and remain crime free, Garcia explained, "I can say that as long as I stay away from everybody that has a negative way of thinking, if they're caught up in drugs, as long as I stay away from them kind of people, pretty much I can – and stay in the programs that I've been going through in prison, I know that with my sister's help, family, and the time that I've spent here in prison already, I don't want to come back no more. I'm tired. I have – I want to be able to enjoy my grandkids."

Garcia included in his reply papers various documents which he believed supported his petition. These documents, as well as Garcia's testimony at the hearing, establish that when he began his prison sentence he was an associate of the Northern Structure prison gang. By the year 2000, Garcia had dropped out of the gang, and was participating in the prison debriefing process. Garcia apparently completed the

11.

debriefing process and was considered a "drop-out" by prison officials. He completed the transitional housing unit education and work programs. Reports prepared by Garcia's work supervisors were generally positive, and indicate his performance was either satisfactory or above average.

Garcia testified he was not involved in gangs until he was in prison. He admitted he and another gang member assaulted another prisoner when instructed to do so by a gang member. He was eventually transferred to Pelican Bay State Prison and housed in the secured housing unit. Motivated by a visit from his wife and daughter, Garcia told a correctional officer he wanted to drop out of the gang. He was debriefed by correctional officers, placed in different housing, and completed various programs and classes. These classes helped him cope with his emotions better. One of the primary methods of coping is to clean his cell, which helps him calm down.

Several work supervisor's reports for the period of 2008-2011 indicate Garcia performed exceptionally or above average. Several program review reports for the years 2007, 2008, 2009, 2010, 2011 indicate Garcia did not have any problematic behavior. These reports appear to have been prepared for the primary purpose of reviewing Garcia's single occupant cell status.

Garcia also provided documentation that he attended AA and NA meetings during 2012 and 2013. He presented a "Certificate of Achievement" for his participation in AA. He also presented a "Certificate of Achievement" as a result of his participation in "Criminals & Gang Members Anonymous." The staff sponsor for AA and NA confirmed that Garcia actively participated in meetings for both groups for a period of several years. She wrote that Garcia "always contributes great insight and shares his personal life trials and tribulations with the group and his peers in the group seem to listen when he speaks. He is consistently an active participant in the group and is willing to share just to try and help someone else see they are not alone in their recovery. He has always been respectful towards myself and his peers. I have seen great growth in Mr. Garcia's character in the

time I have known him. Mr. Garcia has shown great dedication to his recovery by attending and participating in AA, NA, and CGA for so many years and I commend him on his efforts." A second staff sponsor prepared a document that was similarly laudatory of Garcia.

Garcia provided a certificate indicating that in 2000, he had successfully completed a course in "Creative Conflict Resolutions." He also completed classes in substance abuse and emotional health, stress and anger management, creative writing, parenting, stress management. The anger management and stress management classes were taught by psychologists. In 2004, Garcia successfully completed a workshop on recovery from addictive behaviors and the dangers of relapse.

Garcia also included "Lauditory Chronos" from 10 correctional officers and one teaching assistant, dated from December 2012 through May 2014. These testimonials chronicled Garcia's work ethic and his ability to work with others, including staff and inmates. All but one opined Garcia was a good candidate for parole, and if released would likely become a productive member of society. The exception made no comment on this issue.

*Discussion*

This comprehensive review of the record establishes that Garcia had a troubled childhood, and chose the path of substance abuse to medicate himself. To support his chosen path, he turned to crime. His crimes were numerous, although there is no evidence any victim was ever injured. While in prison, he initially chose to join a prison gang, and committed an act of violence (attacking another inmate in 1996) at the direction of the gang. In 1995, he incurred his third strike by possessing drugs in prison, which he admitted were both for sale and for personal use. By 2000, however, Garcia had dropped out of the gang, and eventually completed the prison drop out program. Since that time, any documented behavior problems were minor, with the possible

13.

exception of the 2005 mutual combat with another inmate who Garcia caught stealing sheets.

While this record makes a strong statement on Garcia's behalf, it does not establish the trial court abused its discretion in denying the petition. The trial court focused on Garcia's in-custody behavior and mental health issues. When initially imprisoned, Garcia had numerous rule violations including several fights with other inmates. The psychiatric reports suggest having to share a cell with another inmate causes Garcia anxiety thereby aggravating his obsessive compulsive disorder. While it is true Garcia's behavior has improved over the years, the trial court may have been concerned the improved behavior is directly related to the special treatment he has received resulting in his single cell status.

We also note that Garcia only recently began to take his AA and NA meetings seriously because he thought they would lead to an early release. While Garcia's honesty is to be commended, the trial court may have been concerned that the recent commitment would be quickly forgotten if Garcia was released, leading him to a return to alcohol and drug abuse. Since Garcia attributed his criminal behavior to his history of drug and alcohol abuse, if he failed to remain sober once released it is likely he would return to the same lifestyle. This lifestyle would pose an unreasonable risk to public safety. Accordingly, the trial court did not abuse its discretion in denying the petition.

## DISPOSITION

The order denying Garcia's petition pursuant to Penal Code section 1170.126 is affirmed.